FILED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

99 AUG -3 AM 9: 56

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| **JENNIFER PAIGE WATWOOD,** | ] | |
| Plaintiff, | ] | |
| v. | ] | CV-98-N-1462-NE |
| **SURGICAL ARTS, P.C.,** | ] | |
| Defendant. | ] | |

### MEMORANDUM OF OPINION

ENTERED

AUG 03 1999

### I. INTRODUCTION.

In this pregnancy discrimination case, the plaintiff, Jennifer Paige Watwood ("Ms. Watwood"), alleges that her former employer, Surgical Arts, P.C. ("Surgical Arts"), violated the Pregnancy Discrimination Act, ("PDA"), 42 U.S.C. § 2000e *et seq.* by terminating her employment following a leave of absence from work due to pregnancy related illness. This matter is presently before the court on the defendant's motion for summary judgment filed April 30, 1999. The motion has been fully briefed and upon due consideration, the motion will be granted on all claims and the action will be dismissed.

### II. STATEMENT OF FACTS.[1]

The relevant facts for the purpose of summary judgment, viewed in the light most favorable to the nonmoving party, are as follows:

---

[1] The facts as set out in the "Statement of Facts" are gleaned from the parties' submission of facts that are claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. See *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

Ms. Watwood was employed by Surgical Arts as a registered nurse ("RN") from August 12, 1996 until her termination on July 3, 1997. Surgical Arts, P.C. ("Surgical Arts") is a small yet busy surgical practice which, at the time of plaintiff's employment, consisted of four physicians. Ms. Watwood's job duties involved performing nursing-related tasks and it is undisputed that during her tenure with Surgical Arts, Ms. Watwood was a competent nurse. By its own testimony, Surgical Arts considers its RNs to be important staff members. Plaintiff was one of only two RNs. Donna Cook was the other RN and the Nurse Manager. Surgical Arts also employed two medical assistants, Charlotte Leopard and Tammy Vass, neither of whom were licensed or certified in any manner. Ms. Watwood worked primarily with Dr. Windham and Dr. Smith. Ms. Watwood's scheduled hours were Monday through Friday, 8:30 a.m. to 5:30 p.m., but she also worked overtime as needed. Donna Cook had the same schedule as plaintiff and also worked overtime. The court also notes that prior to Ms. Watwood's termination, Ms. Watwood and Donna Cook had discussed the possibility of hiring another nurse because they were so busy.

Although Surgical Arts had several employees, the only employees who are relevant to this court's evaluation include Sonya Bates who was a scheduler/medical coder, Rehna Bosswetter who was the medical transcriptionist, and Reba Quattlebaum who was the office manager.

On April 27 or 28, 1997, Ms. Watwood learned she was pregnant and informed everyone at Surgical Arts of her pregnancy shortly thereafter. A few weeks later Ms. Watwood began

2

having complications and was admitted to the hospital on May 17, 1997.[2] While in the hospital, she was diagnosed by her obstetrician, Dr. Lucas, with pregnancy-induced hyperemesis.[3] Ms. Watwood received a note from Dr. Lucas excusing her from work May 19 through June 2. On June 2 she was released to return to work for four hours per day. On June 2, 3, 5 and 6, Ms. Watwood worked approximately four hours each day. She did not work on June 4.[4]

On June 4, Dr. Lucas told Ms. Watwood that she could return to full time work beginning June 9. On June 9, Ms. Watwood came to work for about 20 minutes but was unable to work so she went to see Dr. Lucas and was admitted to the hospital later that day. She remained in the hospital until June 11. Ms. Watwood again received a note from Dr. Lucas excusing her from work June 9 - 16. On June 16, she presented Surgical Arts with another note from Dr. Lucas excusing her from work from June 16 through July 4.

Ms. Watwood had an appointment with Dr. Lucas on July 2. Although she does not recall the specific date that she received it, she ultimately received a note from Dr. Lucas that stated that she could return to work for four hours per day beginning July 7. Ms. Watwood contends that she told Donna Cook (at some point after her doctor's appointment on July 2) that she had been released to work four hours per day the week of July 7, and,

---

[2] For clarity, all dates referenced without a year refer to events that occurred in 1997.

[3] Hyperemesis is the medical term for vomiting uncontrollably.

[4] The plaintiff contends that she was instructed not to come in on June 4th by Donna Cook because there were no patients to be seen that day.

3

if she did well, eight hours per day beginning July 14.[5] However, Ms. Watwood states in her deposition that Dr. Lucas told her that she was not supposed to work any overtime.

Regarding the plaintiff's appointment on July 2, the parties' stories diverge. The defendant contends that Ms. Quattlebaum requested that Ms. Watwood come by Surgical Arts to let them know of her return-to-work status after her appointment with Dr. Lucas.[6] Ms. Watwood, however, denies ever having been requested to come by the office that day. Although the details are sketchy, Ms. Watwood states that she did speak to Donna Cook on July 2 and she told Donna that she would be able to work four hours a day the week of July 7 and then eight hour days the following week.

On or about July 2 or 3, the defendant decided to terminate Ms. Watwood allegedly because she could not be counted on to work full-time and overtime as her RN position required. *Smith Depo.* at 15-16; *J. Iacobelli Depo.* at 19-20; *Windham Depo.* at 18-19. On July 3, Ms. Quattlebaum telephoned Ms. Watwood to tell her she was being terminated because she was unable to fulfill her job duties, including the ability to work overtime as needed. Ms. Quattlebaum followed up the conversation by sending a letter to Ms. Watwood setting out the reasons for her termination.

On or about October 22, 1997, Ms. Watwood filed a charge of discrimination with the Equal Employment Opportunity Commission. Subsequently, on June 8, 1998, she filed her

---

[5] Although the defendants deny knowing that Ms. Watwood would have been allowed to return to eight hour days on July 14th if everything went well during the week of July 7th, the court must view the facts in the light most favorable to the plaintiff.

[6] The court notes that Surgical Arts contends that the "straw that broke the camel's back" was Watwood's failure to come by the office during the week prior to her termination to advise of her status. *Windham Depo.* at 23-25. Additionally, Dr. Windham contends that Watwood had not been "commonly courteous" in keeping the office informed of her status. *Windham Depo.* at 23.

4

complaint in this action alleging that the defendant violated the PDA by terminating her employment following a leave of absence from work due to pregnancy related illness.

### A. THE COMPARATORS.

Although the plaintiff's allegations of disparate treatment tend to overlap quite a bit, Ms. Watwood basically alleges that three individuals were treated more favorably than she or that the rules were applied to these employees in a disparate manner. The key employees are Ms. Sonya Bates, Ms. Rehna Bosswetter and Ms. Reba Quattlebaum. The court will address the plaintiff's allegations regarding each of these employees individually.

### Ms. Sonya Bates.

Ms. Watwood contends that Sonya Bates, the scheduler/medical coder, was treated more favorably than the plaintiff because Ms. Bates was allowed to leave at 5:30 every day to pick up her child from day care. Ms. Watwood states that because Ms. Bates was allowed to leave at 5:30, the nurses were required to shoulder Ms. Bates' duties of taking patients' co-payments and informing the patients that Ms. Bates would call them later to schedule appointments. Furthermore, Ms. Bates was treated more favorably because she was later allowed to have every Friday off.

### Ms. Reba Quattlebaum.

Next, Ms. Watwood contends that Reba Quattlebaum, the office manager, was treated more favorably than Ms. Watwood because she was allowed to be away from work for a longer period of time than Ms. Watwood. Ms. Quattlebaum was away from the office for 37 days due to clinical depression. Ms. Watwood states that, unlike

5

herself, Ms. Quattlebaum was neither disciplined nor terminated because of these absences.

### Ms. Rehna Bosswetter.

Finally, Ms. Watwood alleges that Rehna Bosswetter, the medical transcriptionist, was treated more favorably than Ms. Watwood because Ms. Bosswetter was allowed to leave work during the day to pick her children up from school and then return to work. *Watwood Depo.* at 185-86.

The appropriateness of plaintiff's use of these three individuals as comparators will be discussed *infra*.

### B. THE OFFENSIVE/DISCRIMINATORY COMMENTS.

To support her allegation that she was discriminated against because of her pregnancy, Ms. Watwood points to comments made by Drs. Iacobelli, Windham and Evans. The context and accuracy of the statements are disputed.

1. First, when Ms. Watwood told Dr. Iacobelli she was pregnant, Dr. Iacobelli stated that "they didn't want no whiney, wimpy pregnant people." *Watwood Depo.* at p.86. Although Dr. Iacobelli admits making the comment, she claims it was intended as a joke. Ms. Watwood acknowledges that she believed Dr. Iacobelli's comment was made because a nurse who worked at Surgical Arts prior to Ms. Watwood "whined and was wimpy and complained all the time while she was pregnant." *Watwood Depo.* at 88.

2. Second, Ms. Watwood alleges that when she told Dr. Windham she was pregnant, he said "you've got a lot of nerve, girl." *Watwood Depo.* at p.86. Again, the parties have different explanations for the comment. Dr. Windham concedes that he made the comment, but he testified that the comment was followed by "Paige, I think that's great. You know

6

that this is an exciting time in your life. Don't worry about it. It won't be a problem." *Windham Depo.* at 32. However, by affidavit, Ms. Watwood denies that Dr. Windham ever said anything to her to that effect. *Watwood Aff.*

3. Third, Ms. Watwood contends that at some point she told Dr. Evans that "nobody seems to be happy that I'm pregnant or everybody seems to be ill that -- everybody's attitude has changed, it's like everybody is upset because I'm pregnant." *Watwood Depo.* at 92. Ms. Watwood states that Dr. Evans' response to her was "no, it's just that . . . he knew that the girls in the office were young and that they knew that we would want to start families, but when those babies arrived, we wouldn't want to leave them." *Watwood Depo.* at 86, 92. Dr. Evans' version of the conversation is that Ms. Watwood "was upset that there was very little fanfare among the other office employees," and he told her that "personally [he] was very happy for her and excited, and [he] tried to just reassure her that they were also happy for her but that young people getting pregnant and having babies in [their] office was not an unusual thing, . . . and that they are all very busy and maybe they don't stop to notice it as much as they should because it is not particularly unusual in [their] office." *Evans Depo.* at 21. Dr. Evans also testified that he recalled another conversation that occurred possibly during the time that Ms. Watwood was able to work for four hour days when he noticed that Ms. Watwood was not feeling well and he commented that he "had seen a lot of young women that have been pregnant and had families and been working moms and that it's difficult, particularly if you are sick, and that it is equally difficult to come back to work after the baby is born, but that other women had done it and [he] was sure she could do it too." *Evans Depo.* at 21-22.

7

## III. SUMMARY JUDGMENT STANDARD.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Where the nonmoving party will bear the burden of proof at trial, there is no requirement, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 323. "Instead, the moving party simply may '"show[ ]"--that is, point[ ] out to the district court--that there is an absence of evidence to support the nonmoving party's case.'" *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir.1991) (*en banc*) (quoting *Celotex*, 477 U.S. at 324); *see also Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (same); *Young v. City of Augusta*, 59 F.3d 1160, 1170 (11th Cir. 1995). However, "it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party must instead make an "affirmative showing" that crucial evidence is missing "by reference to any combination of the following: pleadings; deposition testimony of a party or its witnesses;

8

affidavits; responses to interrogatories . . . ; requests for admission . . . ; and any other exchanges between the parties that are in the record." *Cheatwood v. Roanoke Industries*, 891 F. Supp. 1528, 1533 (N.D. Ala. 1995) (Hancock, J.).

"Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial." *Four Parcels of Real Property*, 941 F.2d at 1437-38 (11th Cir.1991).

At this stage, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. *Id.* at 324. The nonmoving party must make a specific, affirmative showing that a genuine factual dispute exists. If the required showing is not made, "summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

After the plaintiff has responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are

functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. DIRECT EVIDENCE.

There are two ways to establish a pregnancy discrimination case of this type - direct evidence or circumstantial evidence. Direct evidence is defined as "evidence, which if believed, proves [the] existence of [the] fact in issue without inference or presumption. Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." *Taylor v. Runyon*, 175 F.3d 861, 867 (quoting *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (internal citations and quotation omitted). However, "[o]nly the most blatant remarks whose intent could only be to discriminate. . . . constitute direct evidence." *Clark v. Coates & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993); *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990). The court notes that Ms. Watwood properly does not contend that the statements set forth above constitute direct evidence.

## V. THE MCDONNELL DOUGLAS FRAMEWORK.

Because the plaintiff seeks to establish her claim of pregnancy discrimination based solely on circumstantial evidence, the familiar framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) governs this court's inquiry.

Under the *McDonnell Douglas* framework, a plaintiff seeking to establish a claim based on circumstantial evidence has the burden of establishing a *prima facie* case of

11

discrimination or retaliation. "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring the defendant to articulate some "legitimate, nondiscriminatory reason" for the allegedly discriminatory employment action. *Id.* "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991), cert. denied, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metal Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], [s]he must present 'significantly probative' evidence on the issue to avoid summary judgment." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), cert. denied, 488 U.S. 1004 (1989)) (other citations omitted) (alterations in original).

The plaintiff may prove that the defendant intentionally discriminated against her "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy

12

of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir.), cert. denied, 474 U.S. 1005 (1985)). However, "'to withstand a defendant's motion for summary judgment, a plaintiff has to do more than establish a prima facie case and deny the credibility of defendant's witnesses.'" *Howard v. BP Oil Co.*, 32 F.3d 520 (11th Cir. 1994) (quoting *Brown*, 939 F.2d at 950). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, nondiscriminatory reasons for its actions." *Isenbergh*, 97 F.3d at 444 (quoting *Young*, 840 F.2d at 830). Plaintiff must instead "produc[e] sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable."[7] *Howard*, 32 F.3d at 526.

If a plaintiff succeeds in this burden, the "disbelief of the defendant's proffered reasons, together with the *prima facie* case, is sufficient circumstantial evidence to support a finding of discrimination" and to preclude summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997). Because of the difficult factual questions involved in assessing "an employer's true motivations," once the plaintiff has presented evidence raising a question about those motivations summary judgment is ordinarily inappropriate. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If evidence in the record "demonstrate[s] 'such weaknesses, implausibilities, inconsistencies,

---

[7] In other words, a defendant can carry its initial burden on summary judgment on the pretext issue by presenting extensive proof to support its legitimate nondiscriminatory reason. If the defendant can show that its preferred reason was the real reason, it need not prove a negative by showing that the plaintiff cannot prove pretext. Pretext and a legitimate reason are, after all, two sides of the same coin. Proof of one disproves the other.

13

incoherencies or contradictions in the employer's preferred legitimate reasons for its action that a legitimate factfinder could find them unworthy of credence,'" the final assessment of the employer's motivation must be left to the jury. *Combs*, 106 F.3d at 1538.

## VI. DISCUSSION.

A claim of pregnancy discrimination is analyzed in the same way as other Title VII sex discrimination claims. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1312-13 (11th Cir. 1994). Title VII declares that it is unlawful for an employer to discharge "or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions or privileges of employment" on the basis of an individual's sex. 42 U.S.C. § 2000e-2(a)(1). As amended, the Pregnancy Discrimination Act of 1978 ("PDA") explicitly includes within these protections discrimination "on the basis of sex . . . because of or on the basis of pregnancy, childbirth, or related medical conditions." *Armstrong*, 812 F. Supp. 1183, 1189 (M.D. Ala. 1993) (quoting 42 U.S.C. § 2000e(k)).

In the absence of direct evidence, Ms. Watwood may establish a prima facie case of pregnancy discrimination based upon a disparate treatment theory by showing four elements: (1) that she was a member of a protected class (pregnant); (2) that she was qualified for the position at issue; (3) that she suffered an adverse employment action; and (4) that she was replaced by someone outside the protected class (non-pregnant).[8] *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 2747 (1993); *Nix v. WLCY*

---

[8] Although Ms. Watwood indicates that the fourth prong of the prima facie case should be that "she suffered from differential application of work rules" the court recognizes that the fourth prong as listed by the defendant is actually easier for Ms. Watwood to establish; and because the Eleventh Circuit has used both criteria, the court elects to apply the defendant's standard.

14

*Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984). *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Texas Dep't of Community Affairs,* 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

If the plaintiff successfully establishes her prima facie case, the analysis then proceeds through the legitimate non-discriminatory reason and pretext stages. Ultimately, a plaintiff who alleges disparate treatment on the basis of pregnancy must establish that the employer intended to discriminate against the plaintiff on the basis of her pregnancy. *Armstrong*, 33 F.3d at 1313. "[T]o prevail on a pregnancy discrimination claim, [Ms. Watwood] ha[s] the burden to show that she was 'treated differently because of her pregnancy' or a pregnancy-related condition." *Deneed v. Northwest Airlines, Inc.,* 132 F.3d 431, 435 (8th Cir. 1998) (citing *Geier v. Medtronic, Inc.*, 99 F.3d 238, 241 (7th Cir. 1996).

### A. THE QUALIFICATION PRONG.

Both parties agree that in order to make out the second element of her prima facie case, Ms. Watwood must prove that she is "qualified" for her position. In fact, the "qualification" element is the only prong of Ms. Watwood's prima facie case the defendant disputes. Surgical Arts contends that Ms. Watwood was not qualified for the position because she was unable to work a full daily schedule, including overtime when required. The plaintiff advances two main objections to the overtime requirement; first, that the requirement itself was flexible and vague; and second, that exceptions to the requirement were made for other employees. In evaluating the "qualifications" aspect, the court must address two main areas: (1) whether overtime was a legitimate, objective job requirement; and (2) whether the overtime requirement was equally applied to other employees.

In accord with the approach taken by other courts, the Eleventh Circuit has been reluctant to allow subjective or unwritten job requirements to bar a plaintiff's prima facie case. However, requirements which are sufficiently clear and can be objectively applied are relevant at the prima facie stage, whether or not they are mandated in writing. *See Carter v. Three Springs Residential Treatment*, 132 F.3d 635 (11th Cir. 1998); *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994); *Fowler v. Blue Bell, Inc.*, 737 F.2d 1007, 1011 (11th Cir. 1984). *See also Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1336, 1344-45 & n.8 (9th Cir. 1981), cert denied, 459 U.S. 823, 103 S. Ct. 53, 76 L. Ed. 2d 59 (1982); *Legrand v. Trustees of Univ. of Ark. at Pine Bluff*, 821 F.2d 478, 481 (8th Cir. 1987). It is true that Surgical Art's "full time plus overtime" requirement was flexible in some respects. The only written explanation of the requirement[9] can be found in Surgical Art's Personnel Policies Manual, which states that "Office hours are from 8:00 to 5:30 . . . . As in all medical office environments, there are times when late hours will be expected. Clinical staff are expected to work until the last patient is seen and all work areas have been cleaned." Thus, as the plaintiff points out, overtime was not always required of every employee. In fact, the defendant made some effort to arrange its employee's work schedules in such a way as to avoid overtime.

However, as a practical matter, it is quite clear that overtime was sometimes required of the clinical staff. Often the doctors still had patients to see when the ordinary work day

---

[9] The parties have filed two different versions of the written job description for the plaintiff's job. One explicitly lists overtime as a requirement, the other does not. Ms. Watwood contends that the written job description she received does not specifically list overtime. For purposes of summary judgment, the court will accept Ms. Watwood's version and assume that the job description does not list overtime as a job requirement. Thus overtime is explicitly required only by the personnel manual.

16

ended, and it was imperative that a nurse or other clinical employee be there to assist. *See Quattlebaum Depo.* at 52. Thus, just as the personnel manual stated, overtime was required *when needed*. There is ample evidence that the clinic ran into overtime quite regularly,[10] and Ms. Watwood does not really dispute this point. Indeed, she concedes that, prior to her pregnancy, she had no problem with her ability or willingness to work overtime, and, in fact, she received the highest possible rating on her performance evaluation for overtime. It is essentially undisputed that, before her pregnancy, Ms. Watwood was required to and did work overtime.[11]

The defendant, in writing and in practice, required its clinical employees to work forty plus hours each week when needed. This requirement is sufficiently clear and verifiable to bar the plaintiff's prima facie case, if in fact it was applied uniformly and she failed to comply with it. Ms. Watwood admits that she was not prepared to work overtime, and indeed at the time of her termination had not been released even to work a full eight hour day. *Compare EEOC v. Ackerman, Hood & McQueen, Inc.*, 758 F. Supp. 1440, 1451 & n.15 (W.D. Ok. 1991)(denying summary judgment where there was a factual dispute regarding the plaintiff's ability to work overtime). She therefore attacks the overtime requirement

---

[10] The plaintiff makes much of the fact that the doctors wished to avoid overtime work by the staff for financial reasons, and had even tried to devise a flexible nursing schedule which would keep the nurses as close to forty hours per week as possible. This point actually underscores the defendant's position. First, the flexible schedule required the nurses to trade off, with one nurse staying late throughout the week and then taking Friday off. However, late nights are exactly what the plaintiff had been instructed to avoid. Second, and more importantly, the high level of overtime which spurred the doctors to action reinforces the defendant's position that there was a need for overtime, and that the clinical staff, as a matter of course, worked overtime regularly.

[11] Much attention and discussion has been focused on the overtime issue, however, overtime issue aside, the court recognizes that at the time of Ms. Watwood's termination on July 3rd, she was supposed to be able to return to work on July 7th for only four hours a day and, if everything went well, *might* be able to work eight hours a day beginning July 14th. Accordingly, as of the time of her termination, Ms. Watwood was not able to work even full-time, much less overtime.

principally by pointing to other employees who she contends were not held to the same standard.

The crux of plaintiff's case is that the defendant tolerated behavior in non-pregnant employees no different from the behavior that led to her termination. The plaintiff contends that allowances were made so that other employees were not forced to work overtime, and that other employees were given extended leaves of absence in which they worked little, if at all. At the qualifications prong, this argument is relevant because a job qualification which is unevenly applied cannot defeat a prima facie case. *See Lane v. Ogden Entertainment, Inc.*, 13 F. Supp. 2d 1261 (N.D. Ala. 1998)(holding that even if strict qualifications exist, the plaintiff may prevail if the defendant ignored the requirement).

Although Ms. Watwood points to several instances where employees have been treated differently than she was, her argument is fatally flawed in that none of the other employees are similarly situated to her. The three employees she points to - the office manager, the medical transcriptionist, and the scheduler/medical coder - all worked in non-clinical positions. While Ms. Watwood makes much of the fact that these employees can and occasionally have filled in for the nurses on some tasks, this is simply not their primary job. The bottom line is that a doctor's office cannot run without clinical staff, and it was up to the doctors to determine the duties and responsibilities they would assign to nurses and to other unlicensed employees, and the levels of staffing required to operate effectively. The evidence establishes that, long before Ms. Watwood became pregnant, clinic policy required a nurse or at least a medical assistant to be present to handle clinical duties whenever patients were in the clinic. The fact that this may not have been legally necessary,

18

that other clinics were run in different ways,[12] or even that the defendant's clinic ran for brief periods without R.N. oversight does not mean that the clinic was required to maintain this state of affairs indefinitely or face a lawsuit. The law does not require the clinic to substitute a medical coder or office manager in place of an R.N., even if such a substitution were possible. In the long run, additional full time nursing staff was required in order for the doctors at Surgical Arts to maintain the level of staffing they had established as necessary. The plaintiff simply was not doing what her job demanded. Accordingly, she was not qualified for the position. Therefore, summary judgment is due to be granted on the qualification issue.

### B.   PRETEXT.

Although Ms. Watwood contends that the comments[13] made by several of the physicians regarding Ms. Watwood's pregnancy are evidence of pretext, this argument is moot because the court has concluded that Ms. Watwood has failed to establish her prima facie case. Accordingly, it is unnecessary for the court to address the pretext issue.

### VII.   CONCLUSION.

Ms. Watwood has failed to make out her prima facie case, specifically by failing to show that she was qualified for the position; therefore, the defendant's motion for summary judgment is due to be granted in all respects. A separate order will be entered in conformity with this memorandum of opinion.

---

[12] For example, the plaintiff notes that Surgical Art's satellite office in Hartselle operated differently. This does not take away the clinic's right to maintain higher staffing standards in its larger, main office.

[13] These comments are outlined in the "Facts" section of this opinion *supra*.

19

Done, this 3rd day of August 1999.

                                            Edwin Nelson
                                    United States District Judge